IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| FRIENDS OF CONGAREE SWAMP, ) <br> SOUTH CAROLINA WILDLIFE ) <br> FEDERATION, AND AUDUBON ) <br> SOUTH CAROLINA, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> FEDERAL HIGHWAY ADMINISTRATION, ) <br> and ROBERT L. LEE, Division Administrator, ) <br> FHWA, ) <br> Defendants. ) <br> _____) | C/A No. 3:06-CV-02538-MBS |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Friends of Congaree Swamp, South Carolina Wildlife Federation, and Audubon South Carolina (together known as "Plaintiffs") has filed suit against the Federal Highway Administration ("FHWA") and Robert L. Lee, division administrator of FHWA (together known as "Defendants"). Plaintiffs moved for summary judgment on September 7, 2007 (Entry 42). Defendants responded with a cross-motion for summary judgment and a response to Plaintiffs' motion on November 30, 2007 (Entry 53). Plaintiffs filed a memorandum in opposition to Defendants' motion on January 7, 2008 (Entry 57). Defendants filed a reply to Plaintiffs' memorandum in opposition to summary judgment on February 19, 20008 (Entry 67). The matter came before the court for a hearing on September 9, 2008 (Entry 94). The parties agreed to waive the summary judgment standard. The court has considered the applicable law, the memoranda, record, and arguments of counsel, including supplemental argument presented subsequent to the

hearing. The court makes the following findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52.

## FINDINGS OF FACT

1. This case deals with a plan to replace four bridges built in the 1940s that are part of U.S. Highway 601. The highway crosses the Congaree River in the southeastern portion of Richland County and the northeastern portion of Calhoun County. Highway 601 serves as a primary connection between St. Matthews and Eastover, South Carolina. The Congaree River floodplain is home to the largest intact tract of old growth bottomland hardwood forest remaining in the United States. In 2003, Congress transformed a large portion of the floodplain into South Carolina's only national park, Congaree National Park. The bridges to be replaced are currently structurally deficient and do not meet modern design standards. If improvements on these bridges fail to materialize, then at some point they would have to be closed to vehicular traffic.

2. In an effort to modernize and repair the bridges, the FHWA, along with the South Carolina Department of Transportation ("SCDOT") formulated an improvement project formally known as the "U.S. Route 601 Bridge Replacements Project over the Congaree River and Overflow Bridges near S.C. Route 48 to the Congaree River in Richland and Calhoun Counties, South Carolina." This project would move the existing Congaree River Bridge roughly forty-five feet to the west of the current centerline. The three overflow bridges would be replaced and the pavement on all four bridges would be resurfaced. In calculating the amount of new wetlands that would need to be filled in order to complete

      the project, coupled with the size of wetlands that would be returned to nature, the project would result in a net loss of 2.14 acres of wetlands.

3. As federal highway funding was to be used for this project, the FHWA directed the SCDOT to prepare an Environmental Assessment ("EA"), in an attempt to abide by federal regulations. Based on SCDOT's EA and a subsequent three-page addendum, the FHWA made a Finding of No Significant Impact ("FONSI") on November 30, 2005.

4. On September 12, 2006, Plaintiffs filed suit pursuant to the Administrative Procedures Act ("APA") alleging that Defendants violated the National Environmental Policy Act ("NEPA") by failing to generate the mandatory Environmental Impact Statement ("EIS") and that the EA was not an adequate substitute under the law. In addition, Plaintiffs claim that Defendants violated Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303, requiring the FHWA to make special efforts to avoid projects that impact public parks and recreation lands. In their complaint, Plaintiffs seek declaratory relief and a permanent injunction to halt construction.

5. Plaintiffs maintain that the bridge improvement project envisioned by Defendants would run afoul of NEPA, a statute designed to protect and promote environmental quality nationwide, because the project is a major federal action significantly affecting the quality of the human environment. According to Plaintiffs, the NEPA requires an EIS to be generated by the federal agency. In addition, Plaintiffs allege that Defendants have violated 49 U.S.C. § 303 by failing to pursue alternative measures that could avoid impacting public park land.

6. Defendants concede that they did not prepare an EIS, but counter that the EA which was

generated was more than enough to meet the requirements under NEPA. This is because the EA, Defendants allege, considered all alternatives and took the necessary "hard look" required by statute. Defendants also claim that 49 U.S.C. § 303 does not apply in this case.

CONCLUSIONS OF LAW

1. The NEPA establishes "a national policy of protecting and promoting environmental quality." Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996). This preservationist goal is met via a "regulatory scheme for major federal actions that may significantly affect the natural environment." Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 184 (4th Cir. 2005) (citing Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. Fed. Energy Regulatory Comm'n, 143 F.3d 165, 171 (4th Cir. 1998)). However, this goal is not all encompassing, and does not require "an agency to reach substantive, environment-friendly outcomes." Id. Instead, NEPA is designed to ensure that federal agencies take a "'hard look' at environmental impacts before taking major actions." Id.; Hodges v. Abraham, 300 F.3d 432, 438 (4th Cir. 2002) (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)). The Fourth Circuit has held that while there is no universal definition for what constitutes a "hard look" under NEPA, at the very least, a "hard look" must constitute a "thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." Nat'l Audubon Soc'y, 422 F.3d at 185. Such a determination must be made on a case-by-case basis and requires review of "all of the components of an agency's analysis." Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs, 479 F.

Supp. 2d 607, 622 (S.D. W.Va. 2007) (citing Nat'l Audubon Soc'y, 422 F.3d at 186). Such rigorous analysis must not constitute a "second-guessing [of] substantive decisions committed to the discretion of the agency," Nat'l Audubon Soc'y, 422 F.3d at 185, it must not "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Id. at 186 (citing Fuel Safe Washington v. FERC, 389 F.3d 1313, 1323 (10th Cir. 2004)). At the same time, the courts cannot act as a "rubber stamp." Nat'l Audubon Soc'y, 422 F.3d at 185. Thus, "NEPA merely prohibits uninformed--rather than unwise--agency action." Id. at 184 (quoting Robertson, 490 U.S at 350).

2. NEPA requires the preparation of an EIS upon a finding that a proposal will be "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); see Hodges, 300 F.3d at 438. In an effort to bring standardization and order to such a determination, NEPA created the Council on Environmental Quality ("CEQ") which has promulgated regulations to assist agencies. Hodges, 300 F.3d at 438. These regulations require that agencies attempting to determine the potential environmental impact evaluate both the "intensity" and the "context" of the proposed project. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 n.20 (1989). "Intensity" is a "function of ten factors," North Carolina v. FAA, 957 F.2d 1125, 1132 (4th Cir. 1992), which examine "the severity of the proposal's environmental impact." Hodges, 300 F.3d at 438. "Context" requires evaluating "the affected geographic region and its interests." Id.; see also Florida Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 401 F. Supp. 2d 1298, 1310 (S.D. Fla. 2005) (including short and long-term effects in the definition of context).

3. If an evaluation reveals that there will be a significant impact on the environment, then an

EIS is required. See Nat'l Audubon Soc'y, 422 F.3d at 184. However, if an agency is unclear as to the possible environmental impacts of its proposed action, an EA can be completed. Hodges, 300 F.3d at 438. A "concise public document," an EA is an intermediate step designed to determine whether an EIS is required under NEPA. Id. An EA does not automatically absolve an agency of creating an EIS. If it is determined that "*any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken." Sierra Club v. Peterson, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis in original). In situations where an agency determines that there will be no significant environmental impact, a FONSI must be issued. North Carolina., 957 F.2d at 1128; Western Watersheds Project v. Bureau of Land Mgmt., 552 F. Supp. 2d 1113, 1124 (D. Nev. 2008). Though not binding precedent on this court, the Ninth Circuit has routinely held that in situations where an agency decides not to prepare an EIS, the agency must "supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir. 1988)).

4. While shorter and less detailed than an EIS, an EA cannot consist merely of conclusory statements. See Hodges v. Abraham, 253 F. Supp. 2d 846, 854 (D.S.C. 2002) (citing Lower Alloways Creek Twp. v. Public Serv. Elec. & Gas Co., 687 F.2d 732, 741 (3d Cir. 1982). An EA will be deemed to be insufficient if it includes "virtually no references to any material in support of or in opposition to its conclusions." Blue Mountains Biodiversity Project, 161 F.3d at 1214. Conclusions drawn in an EA "'must be supported

by some quantified or detailed information, and the underlying environmental data relied upon to support the expert conclusions must be made available to the public' to allow for informed public comment on the project." Nat'l Res. Def. Council, Inc. v. United States Army Corps of Eng'rs, 457 F. Supp. 2d 198, 218 (S.D.N.Y. 2006) (citing Sierra Nev. Forest Prot. Campaign v. Weingardt, 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005) (internal citations omitted)).  In Western Watersheds Project, the District of Nevada found that an EA was supported by references when viewed holistically, even though there were large portions of the EA that lacked adequate references.  552 F. Supp. 2d at 1129.  However, this conclusion was reached only because of the EA's references to a previous EIS and because the EA included a "lengthy list of references." Id. at 1129-30.  The court warned the Bureau of Land Management that future EAs should make "explicit reference to the scientific and other sources relied upon for conclusions in the environmental document." Id. at 1130.

5. If the court deems that an agency has taken the necessary "hard look" in the environmental review process, then it can judicially intervene only in those situations where the agency has acted in an arbitrary and capricious manner.  Hodges, 300 F.3d at 445.  However, failure to create an EA that meets the necessary regulatory and judicial standards constitutes a failure to take a "hard look" and thus, does not require an arbitrary and capricious finding.  See Hughes River Watershed Conservancy, 81 F.3d at 443 (finding that a two step inquiry exists with the first step determining if an agency took a hard look).

6. The text of Defendants' EA plus its appendices runs thirty eight pages.  AR 848-886.  An EA addendum was subsequently filed.  AR 181.  While long on illustrations and graphs,

      the EA lacks the rigorous analysis or references that are required by both the text of NEPA and the mandates of courts interpreting the statute. For example, the section entitled "Terrestrial and Aquatic Wildlife" merely states that "[i]mpacts to wildlife in the project area are expected to be minimal." AR 865. As evidence of this conclusion, the EA states that "the DEPARTMENT has coordinated with the U.S. Fish and Wildlife Service and has determined that the project should not impact any species protected under 50 CFR 402." Id. Such conclusory statements are rife throughout the nineteen pages of text that constitute the main portion of the EA. In Appendix B, Defendants provide correspondence between themselves and other federal agencies, attempting to show that scientific studies were taken into account. EA 874-886. However, these letters are only evidence that previous scientific analysis has taken place, they are not explicit scientific references nor do they provide robust material in favor of the conclusions reached in the EA.

7. The same finding holds true for the EA Addendum. AR 185. For example, the "Indirect and Cumulative Impacts Analysis" provides conclusions as to why Defendants believe that the bridge project would not generate a negative environmental impact, but it lacks the requisite scientific analysis and rigor. EA 186-188.

8. In the absence of an EIS, an inadequate EA compels the conclusion that Defendants failed to take the "hard look" required under NEPA. This court makes a declaratory ruling that in its current form, the EA violates NEPA. Defendants are enjoined from further actions on the bridge program until this deficiency is resolved or a new environmental study, either a modified EA or an EIS, is submitted.

9.  The importance of programs to modernize this country's ailing infrastructure cannot be overstated. There is hardly a task more important for government than protecting its citizens from preventable disasters. While these efforts cannot violate the law, the judicial system should not needlessly place lives in jeopardy. Nothing in this order should be construed as preventing Defendants, or any other appropriate governmental entity, from continuing with existing efforts to repair and maintain Highway 601 in order to ensure safe passage for all travelers.

IT IS ORDERED that judgment in favor of Plaintiff be entered in accordance with Fed. R. Civ. P. 58.

**IT IS SO ORDERED**.

s/Margaret B. Seymour
United States District Judge

Columbia, South Carolina

September 30, 2008.